(91 South. 43)

No. 23120.

## LOUISIANA CONTRACTING CO. v. BOARD OF COM'RS OF PORT OF NEW ORLEANS.

(Jan. 30, 1922. Rehearing Denied Feb. 27, 1922.)

*(Syllabus by the Court.)*

1. **Shipping** ⬤⟐27—**Sale of dredgeboat held to include derrick anchor barge necessary to operation of dredge and spare parts of pump, constituting its main equipment.**

The sale of a dredgeboat "together with her tackle, machinery, apparel and furniture, * * * the pipes and pontoons of the same, and including everything that may serve for the use and operation of said dredge," includes a "derrick anchor barge," shown to be absolutely necessary to the successful operation of the dredge, as also spare parts of a pump constituting its main equipment.

2. **Municipal corporations** ⬤⟐244(1) — **Sales** ⬤⟐4(1)—**Courts may determine character of contract from circumstances, and not form in which it was expressed; party estopped from claiming contract with public corporation in form of sale to be a loan which the corporation is powerless to make.**

Where the parties to a contract are competent to make it one of sale or of loan, as they see fit, courts may, under certain circumstances, look through the form in which it is expressed and determine its real intention from a consideration of those circumstances, but, where one of the parties is a public cor-

poration, authorized to do one thing and prohibited from doing another, and the contract into which it had entered purports to be one that is authorized, the other contracting party can have no standing in court to assert that it was intended to be one that is prohibited, and to ask the aid of a court in its enforcement as such.

O'Niell and Dawkins, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by the Louisiana Contracting Company against the Board of Commissioners of the Port of New Orleans. Judgment for defendant, and plaintiff appeals. Affirmed.

P. M. Milner, of New Orleans, for appellant.

James Wilkinson, of New Orleans, for appellee.

BAKER, J. An opinion prepared in this case by the late Chief Justice was not finally passed on, owing to the change in the composition of the court, and the case was reset for argument, and has been reargued and resubmitted. As the said opinion covers the case completely, and appears to be correct, we now adopt it as that of the court. It is as follows:

### Statement of the Case.

Plaintiff (hereafter called company) prosecutes this appeal from a judgment rejecting its demands for the return of a "certain derrick barge," "shaft and impeller," of which it claims ownership, and alleges that defendant (hereafter called board) unlawfully retains, or, in default of such return, for $4,000 and $300, respectively, alleged to be the value of those articles.

The circumstances out of which the litigation has arisen are as follows:

On July 29, 1914, plaintiff contracted with defendant to do certain filling and dredging on the river front (in New Orleans), the purpose having been to fill, above high water, a certain stretch of the batture, with a view to the erection thereon by defendant of a cotton warehouse, and to the deepening

of the river for the accommodation of ships of heavy draft. The main instrumentality used by plaintiff in its attempt to execute the contract was the dredgeboat Dixie, parts of the equipment of which, as defendant alleges and proves, were the "derrick barge," and the "shaft and impeller" here claimed. Plaintiff appears to have been short of capital and heavily in debt when the contract was entered into, and in the early fall of 1915 reached a crisis in its affairs, when (though defendant had advanced it more than the contract really entitled it to) it was threatened with the seizure of its dredgeboat in satisfaction of a debt of $22,929.06, secured by mortgage, and it applied to plaintiff for a loan of the amount required to meet that obligation. The application having been referred to defendant's attorney, he reported that, in view of the prohibition contained in the Constitution, and reading:

"Art. 58. The funds, credit, property or things of value of the state, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private," etc.

—defendant could not lawfully make the loan, but that, by Act 180 of 1908, proposing an amendment to the Constitution (which was subsequently adopted), it was authorized to "purchase suitable dredges, barges and tugboats," and hence could buy the Dixie on terms that would relieve the situation and afford plaintiff an opportunity to proceed with its work. The negotiations on the part of the plaintiff were conducted by its then president, Mr. Rittenhouse Moore (who died prior to the institution of this suit), and on the part of the defendant, in the main, by Mr. James Wilkinson, its attorney, who therefore found it necessary to give his testimony concerning those negotiations and the contract resulting therefrom which testimony is uncontradicted, and reads in part as follows:

"I cited to Mr. Moore and to the dock board [as defendant is often called] the provisions of the Constitution, * * * and I stated to Mr. Moore * * * that the dock board only had the right to purchase; that the dock board had no right to loan or [on] mortgage, directly, or indirectly, and there must be an absolute purchase by the board; that the board had a right, then, to lease it [the dredge] to him again, and the board had the right to grant him a right of redemption; and he said he was going to lose the dredge anyhow, if he didn't do this, and he would prefer running the risk of losing his barge [dredge] for $22,000, inasmuch as she was about to be seized and sold by the marshal, * * * and that he could make, in his opinion, sufficient money to redeem the dredge out of his contract for the outer fill, and it was on that basis that the resolution was passed by his board, empowering his board [empowering him] to sell it, * * * and it was on that [basis] that the resolution was passed by the dock board, ordering the purchase of the boat," etc.

The minutes of the dock board of September 20, 1915, contain the recital of an agreement with the company to the effect that plaintiff would be released from its former bond and paid $9,570.94 retained by the board, provided it would furnish a new bond for $40,000 and sell the board the Dixie, free of debt and mortgages, with "its tackle, apparel and appurtenances," and further as follows:

"That said board shall have the right to retain said dredge on said work until its completion, and, for said work, shall lease the dredge to the * * * company at an amount equal to the premiums on an insurance policy to protect this board's ownership to the amount of $25,000 in [on] said dredge; the said lease being responsible to this board for all losses or accidents, from any cause, happening to said dredge.

"Said bill of sale to be for $22,929.06, cash; said vendor to have the right to redeem said dredge and shall repurchase the same by the payment of twenty-five (25%) per cent. from the amount of each estimate given it for the balance of said dredging work; the entire balance of said price to be paid out of the final estimate.

"Whereupon, the said Dr. Henry Goldthwaite, vice president of said company, declared he accepted the above contract and condition and the president of the board was empowered to enter into a contract with said * * * company,

sign same and pay said amounts. Said contract to be notarial in form and prepared and approved by the attorney of this board."

On October 13, following, the attorney of the board reported that, after conference with its engineer, with Mr. Moore, president of the contracting company and with the attorney of the company's surety, he had perfected a memorandum of agreement to be completed and executed "at the time of signing the sale of the Dixie, and the completion of the contract as amended by this board, on September 20, 1915; which memorandum, approved by the parties mentioned, dated October 13, 1915, is in evidence, and contains the recitals to wit:

"Whereas the said * * * company, have agreed to sell to said board the dredgeboat Dixie for the sum of $22,929.06 in cash, all in accordance with the resolution of said board, held on September 20, 1915, a copy of which is annexed to and made part of this bond:

"Now, in consideration of the release of said bonding company * * * to the extent of a reduction of their said bond to the sum of $40,-000 * * * the said * * * company consents to the payment of the said $9,570.94 by the said board * * * to the Louisiana Contracting Company."

Thereafter, on October 18, 1915, the directors of the contracting company, by formal resolution, declared:

"That Rittenhouse Moore and Henry Goldthwaite, either or both, be, and are hereby, authorized to dispose of the hydraulic dredge Dixie, for such amount and upon such terms as either or both may see fit. Any action they may take in the premises is hereby authorized and ratified."

And on October 20 following the Dixie was sold to the board by a notarial act signed on behalf of the company by Henry Goldthwaite, vice president (and by the president of the board), and reading in part as follows:

"Personally came * * * Henry Goldthwaite, vice president, * * * duly empowered by resolution, * * * a duly certified copy of said resolution being hereto annexed and made part hereof, who declared that, pursuant to said power, he does hereby sell, transfer, and deliver to the board * * * fully empowered herein by a resolution * * * as per a copy of the said resolution * * * annexed to and made part hereof, and who hereby purchases and accepts delivery, * * * a certain dredgeboat, known as the Dixie, * * * together with her tackle, machinery, apparel, and furniture, together with the pipes, pontoons of the same and including everything that may serve for the use and operation of said dredge.

"This sale is made for the price and sum of $22,929.06, which amount has been paid to the said company in cash by the purchaser, the receipt of which amount is duly acknowledged by the vendor. * * *

"This sale is made subject to the following stipulations and conditions, viz.: First, that the said * * * company does hereby agree to take charge of said dredge, as the lessee of the board. * * * Second, that said * * * company does hereby agree to procure a fire and marine policy of insurance on said dredge, to the amount of $25,000, satisfactory to said board, * * * and that the amount of the premiums due thereon, for one year from date of said policy, shall be paid by said lessee * * * for the rent of said dredge, until the completion of said second fill * * * or the said dredge has been redeemed in the manner hereinafter stipulated. Third, that the said company does hereby waive and abandon any claim for damages, from any source whatever, against the board, * * * for anything growing out of said contract or for any reasonable reduction in the quantity thereof(?); relying on the good faith and just dealing of said board. The said lessee * * * agrees to keep said dredge in good order, at its own expense; to make all necessary repairs thereon; to place said dredge back for work on the second fill of its contract whenever so ordered by the board, and to keep it continuously on said work until the same is finished; and the dredge is not to be subleased or the lease assigned to other persons without the written consent of the board, previously obtained. Fourth, the company is given the right, and it hereby agrees, to repurchase the dredge, for the same price, without interest; and, in order to assure payment, it is agreed that the board shall retain 25 per cent. from each estimate due said company on said second fill and that the entire balance of said purchase price shall be repaid out of the final estimate."

And there are one or two other provisions which need not be stated.

It is not here pretended that the dredge has ever been redeemed or that plaintiff has made any payments or supposed deductions

from its estimates, or otherwise attempted to redeem or repurchase it. At some time (probably) in June, 1916, the dredge appears to have been seized by the United States marshal on a claim against plaintiff, and, the counsel for the two litigants here present having united in resisting the claim, it was bonded by defendant; appearing in the capacity of owner, and plaintiff's counsel admits that the legal title was vested in defendant, though his present contention is that the transaction of October 20, 1915, was a pignorative contract, which inter partes, left the equitable title in plaintiff. There is no doubt that the dredge was worth more than the price stipulated in that contract, and that the right of redemption, as therein reserved, possessed a possible value. When, therefore, plaintiff found itself in about the same financial straits as in the preceding year, or probably worse, since its creditors appear to have become more clamorous, and the dredge was actually seized, it began negotiating with defendant with a view, through its co-operation, of realizing upon said reserved right, or whatever right its counsel may have thought it still had, in the dredge. Its first proposition was based upon a valuation of the dredge, with its appurtenances, of $125,000, which was, however reduced to $85,000, and on June 28, 1916, the board adopted the following resolution, to wit:

'That the offer of the company to accept the sum of $85.000 for the dredge Dixie, pontoons, pipe line and fuel barge, and cancellation of all contracts * * * and the settlement, in full, of all rights between the said * * * company and the board * * * be accepted; from which amount is to be deducted the purchase price of $22,929.06 and all other sums which may have been paid out for account of said Dixie, or may have been guaranteed by this board, * * * or the said Dixie is responsible or liable for.

"The said purchase to be subject to a satisfactory report of the board of survey, to be appointed by the board of commissioners, * * * as to the proper condition of said barge, and its equipment; the vendor to furnish full and satisfactory proof that there are no other liens or claims of any character against said dredge Dixie, pontoon, pipe line, and fuel barge, and to furnish security against any adverse result of the present suit or claim of the River Sand & Gravel Company against said dredge * * * now pending in the United States court. * * * Messrs. Warren Johnson, Supt. J. W. Westerfield, and Engineer J. Devereaux O'Reilly were appointed as a board of survey for the purpose of reporting upon the condition of the dredge Dixie and equipment."

A copy of the foregoing resolution, with specific notice that the board of survey had been appointed (giving the names of the appointees), that they would immediately proceed to make the survey, and that, upon their report, the commissioners would be prepared to act, were embodied in a letter from the president of the board of commissioners to plaintiff's attorney, of date June 29, 1916; and on July 15 following the board of survey made its report, in the body of which mention is made of the "mechanical equipment on the dredge" as "including suction pump" and "suction and discharge pipes," of which it is said:

"At present, the suction pipe is not equipped with a cutter head engine, etc., but this part of her equipment was used at one time, and it was found on the batture at Audubon Park, so nearly submerged in the water that it could not be inspected for condition or competence. * * *

"The balance of the equipment," the report continues, "consists of a discharge pipe and wooden pontoon, all in fair condition a short pipe line, in poor condition, but still serviceable, one oil barge, with a duplex pump, and an anchor derrick barge, with a hoisting engine, steam boiler, boom, etc., both barges and their equipment being in fair condition."

It may be here stated that the dredge possessed no power of locomotion, but was equipped with five heavy anchors, and stayed as anchored until moved by some outside force, which, for short distances, say 50 or 60 feet, was provided by the derrick barge, which barge was also available to handle the anchors and pipe line through which the dredging was done; the wholly uncontradicted testimony on that subject being that

the derrick barge was absolutely necessary to the successful operation of the dredge. The oil (or fuel) barge, it appears, did not belong to the plaintiff, and was released upon the demand of the owner.

"We find the following values," the report goes on, "for the various items in their present condition:

| | | |
|---|---|---:|
| Dredge boat hull with speed boxes, deck fittings, and 2,000 feet of 1'' and ¾'' cable | | $17,000 00 |
| Main deck and upper deck house | | 1,975 00 |
| Steel A frame and steel and wood hog chain posts, and hog chains and steel speed frame and braces | | 1,360 00 |
| Main engine with cylinder, 14'', 22'', 36'', and 18'' stroke, and centrifugal pump, in good condition | $10,750 00 | |
| Deduct new bed plate—installed | 1,880 00 | 8,870 00 |
| Two skotch boilers, 15 ft. diam. by 16' 16'' long with breeckings, stack, umbrella, casing and covering | | 11,420 00 |
| Oil burning equipment | | 1,170 00 |
| Surface condenser, with air and circulating pumps | | 2,100 00 |
| Two feed, two service and one oil pump | | 950 00 |
| One twin cylinder engine for operating swinging drains; five drains; shafting, beaming, gear wheels, handling rigging, etc | | 3,250 00 |
| One electric light equipment, when generator is repaired and completely installed | | 1,250 00 |
| Steam feed water and condenser pipe and covering | | 2,000 00 |

\* \* \* \* \* \* \* \*

### General Miscellaneous Installation.

| | |
|---|---:|
| About 640 feet, 20'' pipe line | $ 1,250 00 |
| Thirty wooden pontoons 20 ft. x 5 ft. and 4 ft. deep | 3,750 00 |
| About 1,938 ft. shore pipe line | 2,150 00 |
| One oil barge, about 84 ft. x 26 ft. and 7 ft. deep, with rake ends and fitted with one duplex pump | 2,550 00 |
| One anchor derrick barge, about 63 ft. x 25 ft. and 5 ft. deep, fitted with double drum hoisting engine, fire box, boiler and stack, pump and frame boom and all rigging | 3,400 00 |
| Cutter, shafting, etc., steel ladder, frame, engine and gears, etc., if in good condition | 4,500 00 |
| Engineer's fee for design and superintendence | 3,350 00 |
| Miscellaneous minor equipment, as per attached list | 1,642 00 |
| The total value of the above equipment comes to | $82,087 00 |

"Respectfully submitted.

"[Signed] J. W. Westerfield, Supt.
"J. Devereaux O'Reilly, Engr.
"Warren Johnson, Cons. Eng."

"The attached list," covering the "miscellaneous minor equipment," the total of which is appraised at $1,642, bears the title "inventory—Tools, Equipment and Spare Gear, Dredgeboat Dixie," and the articles included therein are such things as engine room tools, pipe dies, bolt guides, bolt dies, solid bolt dies and taps (in box); spades and shovels, saws, hammers, chisels, wrenches, tongs, gauges, bathtub, toilet bowl, cabin equipment, including beds, mattresses, sheets, chairs, washbasins, etc.

On July 19, 1916, the board of commissioners adopted the following resolution, to wit:

"It was resolved that the offer of the * * * company to accept * * * $85,000 for their rights of redemption, as set forth in act of sale executed before * * * notary public, dated October 20, 1915, of the dredge Dixie, pontoons, and pipe line, etc., and cancellation of all contracts by and between the board and the * * * company, and the settlement in full of all rights between the said * * * company and the board, * * * be accepted; from which amount is to be deducted the purchase price of $22,929.06, and all other sums which may have been paid out for account of said Dixie, or may have been guaranteed by the board, * * * and all bills or claims for which the board * * * or the dredge Dixie is responsible or liable for. The vendor to furnish full and satisfactory proof that there are no other liens or claims of any character against said dredge Dixie, pontoons and pipe line, etc., and to furnish security against any adverse result of the present suit, or claim of the River Sand & Gravel Company, or any other contested claim against said dredge Dixie now pending in the United States Court.

"All bonds given by said * * * company to secure said contracts are to be canceled and annulled when this contract shall have been fully complied with. It was further resolved that the president, or vice president, is hereby authorized to enter into contract with the said * * * company before * * * Peters, notary, accordingly; contract to be approved by the board's attorney, James Wilkinson, before signature."

On July 20 plaintiff's directors held a special meeting, at which they elected Henry Goldthwaite, president of the company, in place of Rittenhouse Moore, who had died on

June 29, and on "motion," etc., "the sale of the dredge Dixie, pontoons, pipe line, furniture and apparel, to the board of commissioners, * * * together with the right of redemption therein, as reserved in the sale before Arthur Peters, notary, * * * being for * * * $85,000, less the amount paid on the former sale, to wit, $22,929.06, and less such sums as the board of commissioners * * * have paid on account of the working of this dredge up to July 19, 1916," was ratified and confirmed, and the president, Goldthwaite, was authorized to sign the act. It was further resolved:

"That all contracts of whatever character and nature between this company and the board * * * be abrogated and canceled, and the bond therein given canceled, and this company abandon and remit any and all claims against said board."

And on July 21, 1916, the president and members of the board, with its attorney, and the president of the plaintiff company, with its attorney, and the notary, assembled in the offices of the board and spent the entire day in the discussion of the details of the contract, upon the main features of which they had thus apparently agreed; but, save that defendant's counsel contended that the transaction of October 20, 1915, was a sale, with right of redemption and plaintiff's counsel that it was a loan, and that the equitable title to the dredge remained in the company, the exact nature of the discussion is not disclosed. As to the matter thus referred to, it appears that defendant's counsel insisted upon incorporating in the act, as part of the description of the property sold, the words "including any rights of equity of redemption,", to which plaintiff's counsel objected. Upon that point the testimony of plaintiff's counsel runs as follows:

"Q. Is it not a fact, the contract which you say is a sale [meaning the contract of July 21, 1916] is not a sale at all, but simply the equity? A. That is the way you construe it; that is Mr. Wilkinson's way. I had a discussion with Mr. Wilkinson, when we were drawing up the final saying, as to this so-called equity of redemption; I didn't want to put it in; Mr. Wilkinson wanted it put in. I finally said: 'Jim, I don't care what you put in the sale; you are getting the boat and we are getting the money for it; now, if you insist on putting that in, go ahead and do it any way you want,' and I allowed you to put in this equity of redemption for your own reason. Q. Is it not a fact that I refused, positively, to do anything else but purchase the equity of redemption because we had purchased the boat in 1915? A. Yes; you said that, and I said, 'You know, just as well as I do, that is a disguised mortgage.' Q. And didn't I tell you it was not so? A. You did; but I told you there were just as good lawyers as you, who did not think so. Q. Is it not a fact the boat, after she was seized in 1915, in which the vendor was made a party— in which you and I both defended the suit— didn't I and you go into court and defend the Dixie sale, and bond it? A. You had the legal title; you were the only one who could bond it."

The drafting of the contract was finally completed, and the instrument signed, and, as signed, contains the following, to wit:

"That said * * * company does, by these presents, grant 'bargain,' sell, convey, assign, transfer and deliver, with all legal warranties and with subrogation of all rights, titles and interests, which said company now has, or may have, including any rights of equity of redemptions or lessee's rights in and to the dredgeboat Dixie with her pipe lines, pontoons, tackle, machinery, apparel and furniture * * * unto the board * * * herein purchasing and accepting * * * by virtue of a resolution of said board * * * adopted on the 19th day of July, 1916, a certified copy of which resolution is annexed hereto and made part of this act. That annexed to this act is an inventory, made part of the act, and containing an enumerated list of all the property belonging to, and a part of said dredging equipment which is sold and delivered with, said dredge. * * * This sale, transfer, and agreement is made for the price and sum of $56,038.54, which, including the amount given for the former purchase of said dredge, * * * the sum of $22,929.06, and the sum of $60,324.00 paid on account of the working of said dredge by the * * * company, and due by the board, make up the sum of $85,000. That, of the said sum of $56,038.54, the sum of $7,500.00 is hereby paid, in cash to the said Henry Goldthwaite, president, on account of the ven-

dor's lien on said dredge in favor of the estate of the late Rittenhouse Moore, and the receipt of which is duly acknowledged; and the balance of said purchase price and consideration, to wit, the sum of $48,538.54, is hereby retained by the purchaser to be used in paying off all liens, claims, debts, privileges on said dredge Dixie, and the balance, if any to be paid to the vendor, subject to the following conditions" (which conditions are not here drawn in question and need not be recited).

During the negotiations which preceeded the sale in question (on June 27, 1916), plaintiff's counsel wrote a letter to the board, agreeing on behalf on his client to accept $85,000 for the dredge, and saying:

"In doing this, however, we ask the board to eliminate from the charge against the company the cost of the pump and installation. As you are aware, this pump is absolutely new, was bought by the board, installed and has never been used. The request will appeal to the equity of the board and induce it to strike this item or charge from the account of the contracting company; otherwise we will be in the position of paying the full price for the purchase and installation of this pump, and then selling it back to the board at a greatly reduced price. Please take the matter up at once and arrange for the closing of the contract."

The board does not seem to have complied with that request, nor, so far as we can discover, to have noticed it. Some two months after the sale plaintiff wrote to the board, saying:

"On Sunday, September 17, 1916, as you no doubt are aware, the crew of the dredge Dixie, without our consent or knowledge, took the shaft and impeller from a 20″ Morris centrifugal pump belonging to the company, which was lying on the batture, * * * and placed same in a pump on the dredge Dixie. This shaft and impeller is valued at $300; we therefore ask that you mail us check for that amount or return the same to us at once."

To that communication the board replied:

"Our engineer reports that the same [shaft and impeller] is part of our purchase of the dredge Dixie, and its equipment; there is therefore nothing to be returned."

In the meanwhile (on August 26) plaintiff had written to the notary, before the act of sale had been passed, saying, that the report of the board of survey had been improperly attached to the act of sale, and had not been exhibited to plaintiff or its representative, and further as follows:

"The dredge Dixie was sold according to an inventory which was presented, at the time of the signing of the act of sale in the office of the board. * * * The insertion of the appraisement by Warren Johnson et al. in the act of sale is tantamount to a fraud, because said Warren Johnson appraisement refers to an anchor derrick barge which has illegally been taken possession of by the dock board, and which was never mentioned in any negotiations leading up to the sale, nor at the moment of the sale, nor, at the moment of signing the act, in the office of the board. * * * This company will promptly take steps to recover possession of the anchor derrick barge from the board," etc.

And, on the same day, plaintiff's attorney wrote to defendant, inclosing a copy of the letter to the notary, and saying:

"There is no question that the anchor derrick barge was never sold. As a matter of fact, on the night of the sale of the dredge Dixie, the Warren Johnson report was in the hands of Mr. Hardin (a member of the board), and the representatives of the Louisiana Contracting Company, including myself, were not shown it, and it was not a part of the act of sale, prepared the following day in the office of the board. I am informed that you have taken possession of this barge, and demand is now respectfully made of you for its immediate return to the * * * company. In default of immediate return, the board will be charged a rental value for the detention of the vessel," etc.

Defendant's attorney reported adversely to the claim so asserted, and, defendant having acted upon his advice, this suit followed. From the uncertain testimony that we find in the record upon the subject, considered in connection with plaintiff's letter of September, 1916, we are led to infer that a new pump was provided for the Dixie, after its purchase in 1915, and that the shaft and impeller, referred to in plaintiff's letter, were taken out with the old pump. Mr. O'Reilly,

the defendant's engineer, was asked by plaintiff's counsel, "For the equipment of the dredge Dixie you wouldn't want the old and new pump?" and he answered, "Yes, sir; we have it; subsequently we bought another pump for the Dixie; it is necessary in case of emergency." As to the value of the shaft and pump claimed by plaintiff, we find no convincing evidence. In the body of the report of the board of survey it is said:

"The dredge is provided with five anchors and cables, a miscellaneous lot of small tools, such as wrenches, dies, taps, chains, blocks, etc., and a kitchen room and bedroom equipment, all as mentioned in the list attached hereto.

"At present the suction pipe is not equipped with a cutter head engine, etc.; but this part of her equipment was used at one time and it was found on the batture, at Audubon Park, so nearly submerged in the water that it could not be inspected for condition or completeness. We might state that the captain of the dredgeboat informed us that the cutter equipment is in good condition and complete, but that it was removed, because found unnecessary, and therefore discarded. The value placed on this item is a mere speculation based on what an equipment should cost; and we might also add that this equipment may be found necessary at some point along the wharves."

Mr. O'Reilly's testimony concerning the derrick barge reads in part as follows:

"Q. Did that barge have anything to do with the dredge Dixie? A. It is necessary for the operation of the dredge Dixie, in order to handle the pipe line and anchors. It is part of the equipment; it is absolutely necessary to the successful operation of the dredge. * * * Q. Do you know whether they had been working together? A. Yes, sir; they had it to operate the pipe line. Q. This dredge is a suction dredge? A. Yes, sir. Q. Has she any propelling power? A. No, sir. Q. How is she kept in the river? A. By anchors or spuds. Q. Large or small? A. Large; 2,200 or 2,500 pounds. Q. Can they be lifted without the use of a derrick? A. No, sir; not practicably. Q. How about the pipes or pontoons? A. It can be done, but it is not economical or practicable. Q. How long does this pipe line extend that the Dixie used to pump mud ashore? A. About 500 or 600 feet. * * *

"Cross-examination: Q. This derrick barge couldn't move the Dixie? A. No, sir. Q. Whenever you moved the Dixie where you couldn't use the spuds, you had to do it by tug? A. Yes, sir; if it was any distance; if it was only a short distance, we could pull on the anchors * * * and move her 50 or 60 feet," etc.

## Opinion.

[1] As the anchor derrick barge, here claimed by plaintiff, is shown without attempt at contradiction to have been absolutely necessary to the successful operation of the dredgeboat Dixie, and to have been in constant use in its operation, it fell within the description of the property included in the sale of October 20, 1915, and within the terms of C. C. art. 2461, which read:

"Dredgeboat known as the Dixie, * * * together with her tackle, machinery, apparel and furniture, * * * the pipes [and] pontoons of the same, and including everything that may serve for the use and operation of said dredge."

"Art. 2461. The sale of a thing includes that of its accessories, and of whatever has been destined for its constant use, unless there be a reservation to the contrary."

Inasmuch, therefore, as plaintiff sold the dredge, including the barge, on October 20, 1915, and reserved nothing save the right of redemption, it is clear that, on July 21, 1916, it had no right in that property at its disposal save the right of redemption, and, if the barge was not included in the transaction (called a sale) of that date, it still belongs to the defendant, who bought it on October 20, 1915, and is not shown to have parted with its ownership any time thereafter.

Aside from the plain language of the instrument, the law and the evidence effectually close the mouth of the plaintiff to assert that the notarial act of October 20, 1915, evidenced a pignorative contract; for, it is shown, without contradiction, that it was explained to Mr. Moore, who then represented the plaintiff, and to the defendant board, that defendant, a public corporation, han-

dling only public money, derived from taxation, was prohibited in terms by the Constitution from loaning the money which might thus come into its possession to any person or corporation, for any purpose, and that all that it could do to relieve plaintiff's embarrassment was to buy the dredge, which it was willing to do, in order that plaintiff might be enabled to proceed with the execution of its contract, and that Mr. Moore readily acquiesced in that view, and signed the memorandum agreement, containing the declaration, "Whereas the said * * * company have agreed to sell the said board the dredgeboat Dixie, for the sum of $22,929.06, cash," etc., which preceded the execution of the act of sale, signed by Mr. Goldthwaite, plaintiff's vice president.

[2] Where the parties to a contract are competent to make it either one of sale or loan as they see fit, the courts may, under certain circumstances, look through the form in which it is expressed and determine their real intention from a consideration of those circumstances; but where, as here, one of the parties is a public corporation, authorized to buy a thing in the discharge of its functions, but prohibited by the Constitution from loaning the money intrusted to it, and the contract entered into purports to be one that is authorized, and not one that is prohibited, the other contracting party cannot be heard, in a court organized under the same Constitution, to say:

"I knew that this corporation was prohibited from loaning money, and, for that reason I consented that our contract should be made in the form of a sale, but, as between the corporation and myself, it was understood to be a contract of loan, and I ask that it be so sustained and enforced by the court."

It was rather a misnomer to call the transaction of July 21, 1916, a sale, and the act of that appears to us to have been inartificially drawn, but it cannot be construed as evincing an intention to deprive defendant of any property acquired by its purchase of October, 1915.

The inventory referred to in the act of July 21, 1916, is mentioned, as we have stated, in the report of the board of survey under the subtitle, "Miscellaneous minor equipment, as per list attached," and the character of the articles included therein may be understood from the examples given in the foregoing statement of the case, the total valuation being $1,642, as against a valuation of $80,447 placed upon the other articles, included in the report, but not in the list, and among which are to be found the dredge itself and the main constituents of its equipment, such as the suction pump, pipes, pontoons, anchors, oil tanks, oil barge, anchor derrick barge, etc.

Dr. Goldthwaite, plaintiff's vice president, testifies that he checked over the "inventory" and found it correct, and plaintiff's attorney says in his testimony (referring to what occurred in the drawing up, and prior to the signing of the act of July 21, 1916):

"When the act was drawn up by the young lady, on the typewriter, Dr. Goldthwaite took it and sat at the little desk near the window, and the inventory was presented to the Doctor. I walked over to the Doctor, and said: 'Doctor, check the inventory carefully, as that is what you are selling; don't make any mistake about it.' The doctor checked each and every item of the inventory, and told me it was all right, and I said, 'You may sign the act.'"

On his cross-examination, however, the counsel testifies as follows:

"Q. In other words, Mr. Milner, you want to claim the document which is annexed to an original report, which appears, upon its face, as one document, is two documents? A. I don't claim anything as to this document on the Warren Johnson letter head [referring to the body of the report of the Board of Survey], and to which is now attached, with clamps, an inventory of 'tools and equipment.' I say the only document shown to us, at the moment we signed this sale, or any that had ever been shown to us, was the inventory. There never was any dispute that we were selling the dredge Dixie, with pumps, boilers, machinery, and

equipment, all of which is appraised in the Johnson report. Q. Is it not a fact you were not selling that dredge Dixie, at all, but the sale shows you were selling your equity in the dredge, and if you didn't sell the dredge on October 20, 1915, you have never sold the dredge at all? A. That was the only time we sold the dredge. Q. Is it not a fact that the contract, which you say is a sale, is not a sale of the dredge, but simply the equity— A. That is the way you construe it," etc. "Q. Weren't all these tools and furniture and equipment part of the Dixie? A. Mr. Wilkinson, there was some sense in having a detailed list of the tools, or small, minor, things; besides, if you don't specify them, very often they disappear when you come to pass your sale. Q. Do you mean to say the detailed list amounting to a total of $1,642—that is all that we bought? A. No, sir; you bought the Dixie and pontoons and pipe line, but you didn't buy that barge."

Considering, then, that neither the hull of the dredge nor any pumps, pipe lines, boilers, anchors, machinery were listed on the inventory and that plaintiff's attorney admits that they were sold as parts of the equipment of the dredge, it is evident that Mr. Goldthwaite, in checking over some five typewritten pages, listing oil cans, chisels, strainers, funnels, eye bolts, pipe taps, wrenches, etc., could not have failed to discover that the inventory contained but an insignificant proportion of the articles sold; and yet the only articles that plaintiff claims as not having been included in the sale are the derrick anchor barge, which was indispensable to the proper operation of the dredge, and the "shaft and impeller," which, as we understand the testimony, were found on the batture, abreast of the dredge, where they had been put by defendant after its purchase of the dredge and the acquisition of a new pump, similar parts of which they were used to replace.

We conclude that the barge was part of the original equipment which passed with the dredge, and that the shaft and impeller were properly considered as spare parts, which were also included in the sale.

150 La.—19

The judgment appealed from is therefore affirmed, at the cost of the appellant.

O'NIELL and DAWKINS, JJ., dissent.